**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ISAIAH FREEMAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  23-3578** |
| | : | |
| **THE DISTRICT ATTORNEY OF THE** | : | |
| **COUNTY OF MONTGOMERY, THE** | : | |
| **ATTORNEY GENERAL OF THE** | : | |
| **STATE OF PENNSYLVANIA,** | : | |
| **SUPERINTENDENT JOHN SAWTELLE** | : | |

**<u>MEMORANDUM</u>**

**MURPHY, J.**                                                                                        **June 24, 2026**

Isaiah Freeman objects to Magistrate Judge José R. Arteaga's April 16, 2026 report and recommendation (R&R) that his *habeas-corpus* petition (DI 24), as modified by his reply to the Commonwealth's arguments in opposition thereto (DI 34), be denied with prejudice.  Mr. Freeman presents two objections.  First, he asserts that the Magistrate Judge erred in denying relief for his claim that his trial counsel ineffectively failed to investigate, develop, and ensure the presentation of evidence and argument supporting a voluntary manslaughter or third-degree murder verdict.  Second, Mr. Freeman argues that the Magistrate Judge erred in denying his claim that his trial counsel failed to challenge the constitutionality of the imposition of a mandatory life without parole sentence on him as an eighteen-year-old defendant.  He asks us to sustain his objections and either grant him relief or return this case to the Magistrate Judge for an evidentiary hearing.  Alternatively, Mr. Freeman requests that we grant him a certificate of appealability for these claims.  For the following reasons, we agree with Judge Arteaga that Mr. Freeman's ineffective assistance of counsel claims lack merit, dismiss Mr. Freeman's petition without an evidentiary hearing, and decline to issue a certificate of appealability.

## I.    FACTUAL BACKGROUND

## A.    Instant offense and trial proceedings

In 2018, a Montgomery County jury found Isaiah Freeman guilty of first-degree murder and related charges for the fatal shooting of Jordan Scott. *Commonwealth v. Freeman*, No. CP-46CR-0006135-2017 (Mont. Comm. Pl. Ct. 2017). Mr. Freeman belonged to a group called the "Norristown boys" and Mr. Scott belonged to a group called the "Pottstown boys." DI 37 at 2. In early July 2017, the groups were feuding. *Id.* Shortly after midnight on July 5, 2017, Mr. Scott was shot in the back in Norristown. *Id.* at 2-3. Believing that Mr. Freeman had shot him, Mr. Scott video-called Mr. Freeman, and they "had a short, heated exchanged." *Id.* at 3. The next day, Mr. Freeman, William Wilson (an older member of the Norristown boys), and Mr. Freeman's acquaintance, Bryce Byrd, were driving in Norristown when Mr. Freeman spotted Mr. Scott and Taye Wynder (a member of the Pottstown boys) walking down the street. *Id.* Mr. Freeman instructed Mr. Wilson to drive to an alley, after which Mr. Freeman got out of the car, ran to the end of the alley with a pistol, and fired several shots at Mr. Scott and Mr. Wynder — striking Mr. Scott in the abdomen and chest. *Id.* Mr. Scott and Mr. Wynder returned fire. *Id.* Mr. Freeman then returned to Mr. Wilson's car, and they fled. *Id.* Mr. Scott was shortly thereafter pronounced dead at the hospital. *Id.*

Mr. Freeman and Mr. Wilson were charged as co-defendants for the shooting, with Mr. Freeman charged with the first-degree murder of Mr. Scott, attempted murder of Mr. Wynder, and two counts of conspiracy to commit murder, while Mr. Wilson was charged as Mr. Freeman's alleged conspirator. *Id.* at 4. The trial lasted six days, during which Mr. Freeman was represented by John McMahon, Jr., Esq. *Id.* The Commonwealth's case included testimony

from eighteen law enforcement officials and civilians and 116 exhibits, including video footage of the shooting. *Id.* Mr. Freeman testified in his defense and presented seven exhibits, including Facebook records showing messages between him and Mr. Scott and his call detail records. *Id.* at 5. He also attempted to call his sister, Iniyah Evans, as a witness, but was prevented from doing so after the Commonwealth objected that the defense had violated a sequestration order by permitting her to observe testimony; Attorney McMahon acquiesced to this objection, so the court did not issue a ruling. *Id.*

Mr. Freeman tried to mitigate his first-degree murder charge to voluntary manslaughter using the doctrines of imperfect self-defense and heat-of-passion. *Id.* at 6. The Commonwealth attempted to disprove these defenses by presenting evidence of a conspiracy between Mr. Freeman and Mr. Wilson and their motive to kill Mr. Scott due to the feud. *Id.* Nathaniel Howard, Mr. Scott's friend, testified that he witnessed Mr. Freeman tell Mr. Scott on July 5th that he was going to kill him — an accusation which Mr. Freeman denied during his testimony. *Id.* at 6-7. Mr. Byrd also testified, stating that he never saw Mr. Freeman threaten Mr. Scott with harm and that, on July 6th, upon Mr. Freeman spotting Mr. Scott and Mr. Wynder, Mr. Wilson (1) sped up and parked the car at the alleyways; (2) reached under his seat, pulled out two guns, and offered them to Mr. Freeman; and (3) egged Mr. Freeman on to shoot Mr. Scott. *Id.* at 7. Mr. Byrd stated that he then saw Mr. Freeman exit the car, go to the end of the alley, peek around the corner twice, and shoot the gun approximately six times before running back to the car and indicating that he got Mr. Scott in the chest. *Id.* He also asserted that Mr. Freeman appeared "regular" in the car, until he saw Mr. Scott and Mr. Wynder, but that he did not seem upset. *Id.* at 9. Mr. Freeman admitted to falsifying parts of his police statement. *Id.* at 6. He testified that

3

he was not sure what he was going to do when he exited the car but decided his "best bet [was] to try and shoot [Mr. Wynder and Mr. Scott] before" they shot him because he knew that they had guns, and that he was only trying to hurt Mr. Scott so that Mr. Scott would leave him alone. *Id.* at 8.  Mr. Freeman claimed that Mr. Scott had threatened to kill him prior to the shooting, and that this death threat scared him.  *Id.*  He also asserted that his sister, Ms. Evans, called to tell him that late in the morning of July 6th, two men had come looking for him — information which Mr. Freeman said made him very angry, upset, scared, and nervous because he thought Mr. Scott was one of the two men and he knew that those men had guns.  *Id.* at 8-9.  Mr. Freeman further testified that when he saw Mr. Scott and Mr. Wynder walking toward his house before the shooting, he felt those same emotions and believed that they were coming to shoot him.  *Id.* at 9.

Following the close of evidence, Attorney McMahon agreed with the trial court that the evidence did not support an imperfect self-defense instruction to the jury because Mr. Freeman violated the duty to retreat, so the court did not provide such an instruction.  *Id.* at 10.  The trial court did provide a heat-of-passion defense instruction to the jury.  *Id.*  The jury was also instructed on first-degree and third-degree murder, a copy of which they received for deliberations.  N.T. 4/23/18 at 198-202.  Mr. Freeman was found guilty of first-degree murder and conspiracy for Mr. Scott's death and aggravated assault of Mr. Wynder, but he was acquitted of attempted first-degree murder of Mr. Wynder.  DI 37 at 10.  He was sentenced to mandatory life without parole.  *Id.*

## B.    State post-conviction proceedings

Mr. Freeman timely filed a direct appeal, and after the case was remanded to the trial court to address issues not initially raised on appeal, the trial court issued a supplemental Rule

1925(a) opinion. *Commonwealth v. Freeman*, No. 6135-17, 2364 EDA 2018 (Mont. Comm. Pl. Ct. 2019); DI 14-7 at 92-119. Relevant to the claims now before us, Mr. Freeman asserted that the trial court erred in preventing him from calling his sister, Ms. Evans, as a witness. DI 14-7 at 98. The trial court determined that this claim was (1) waived because it was not properly preserved at trial; (2) meritless because Mr. Freeman and defense counsel knew that Ms. Evans was present during trial despite the sequestration order, and defense counsel failed to proffer evidence or an explanation that her presence was inadvertent; and (3) not prejudicial because Mr. Freeman testified at trial that he was provoked by Ms. Evans's call regarding Mr. Scott, and the court provided a voluntary manslaughter jury instruction. *Id.* at 106. The Superior Court affirmed his judgment of sentence, concluding that (1) Mr. Freeman waived any objection to the existence of a sequestration order or the exclusion of Ms. Evans's testimony due to the violation of that order; (2) the trial court ordered sequestration of witnesses at the beginning of trial; and (3) the trial court did not err in excluding Ms. Evans's testimony. *Commonwealth v. Freeman*, 2364 EDA 2018, at *7-11 (Pa. Super. Dec. 22, 2020); DI 14-7 at 156-60.

Mr. Freeman then timely submitted a *pro se* PCRA petition in which he argued that Attorney McMahon was ineffective for (1) failing to investigate and present a diminished capacity defense; (2) insufficiently preparing an imperfect self-defense theory and failing to investigate key defense witnesses; (3) agreeing to the Commonwealth's sequestration-based objection to Ms. Evans's testimony; and (4) presenting no argument regarding the constitutionality of a life without parole sentence based on his age. DI 14-7 at 173-236. His *pro se* submission also included various exhibits demonstrating his mental health, emotional, and school performance issues. Mr. Freeman was appointed PCRA counsel, who filed an amended

5

PCRA petition; this petition did not include Mr. Freeman's claims regarding his age nor the exclusion of Ms. Evans's testimony, nor did it include Mr. Freeman's various school and mental health records. *Id.* at 365-89. Instead, the petition included affidavits from Ms. Evans, Mr. Webb, Mr. Parker, and Jada Jackson and asserted the following ineffective assistance of trial counsel claims: (1) failure to properly investigate, discover, and prepare witnesses to corroborate Mr. Freeman's testimony regarding his fear of death and bodily injury; (2) failure to request an imperfect self-defense instruction; and (3) failure to properly investigate, discover, and present a diminished capacity defense which would have negated Mr. Freeman's ability to form the specific intent to kill. *Id.* at 368-89. The PCRA court held an evidentiary hearing, during which Mr. Freeman, Mr. Parker, Mr. Webb, and Ms. Evans testified for Mr. Freeman, and Attorney McMahon testified for the Commonwealth. N.T. 3/4/22 at 2. The court dismissed Mr. Freeman's amended PCRA petition, finding it lacked merit. DI 14-7 at 484. In its opinion, the PCRA court explained that (1) it credited trial counsel's testimony that Mr. Freeman did not inform him of the availability and testimony of Mr. Webb, Mr. Parker, and Ms. Jackson regarding the July 5th shooting, but that it found incredible the testimony of Mr. Webb and Mr. Parker at the evidentiary hearing; (2) the lack of testimony by Mr. Webb, Mr. Parker, and Ms. Jackson did not change the trial's outcome; (3) the evidence showed that Mr. Freeman violated a duty to retreat; and (4) there was insufficient evidence and authority to support a diminished capacity defense. DI 14-8 at 10-15.

Mr. Freeman timely appealed, asserting that the court erred in denying his ineffectiveness claims based on trial counsel's failure to (1) properly investigate, discover, and prepare defense witnesses regarding Mr. Freeman's reasonable fear of death or serious bodily injury; (2) request

6

a jury instruction on imperfect self-defense; and (3) properly investigate, discover, and present a diminished capacity defense.  DI 14-7 at 499-500.  The Superior Court affirmed the PCRA court, concluding that (1) the issue of calling Ms. Evans as a witness was previously litigated and she was unavailable to testify, and Mr. Freeman never informed Attorney McMahon of Mr. Webb and Mr. Parker, such that Attorney McMahon could not be ineffective for failing to call them; (2) the record and law supported the PCRA court's conclusion that Mr. Freeman was not prejudiced by the lack of testimony from Mr. Webb and Mr. Parker; (3) the record supported the PCRA Court's conclusion that no imperfect self-defense instruction was available to Mr. Freeman; and (4) the record contained no basis for a diminished capacity defense.  *Commonwealth v. Freeman*, 1287 EDA 2022, at *6-11 (Pa. Super. Dec. 29, 2022); DI 14-4 at 6-11.  The Pennsylvania Supreme Court denied Mr. Freeman's petition for allowance of appeal.  *Commonwealth v. Freeman*, 298 A.3d 380 (Pa. 2023) (per curiam).

## C.    Instant habeas petition

The instant, timely-filed habeas petition, asserts the following claims: (1) trial error regarding the exclusion of Ms. Evans's testimony; (2) Attorney McMahon's ineffectiveness regarding his failure to (a) challenge the trial court's exclusion of Ms. Evans, (b) investigate and present mitigation evidence regarding a voluntary manslaughter or third-degree murder conviction, (c) sufficiently prepare Mr. Freeman to testify, and (d) challenge the constitutionality of mandatory life without parole as applied to Mr. Freeman; and (3) cumulative error that deprived Mr. Freeman of his right to due process, a fair trial, and effective assistance of trial counsel.  DI 34 at 1-13.  On April 16, 2026, Magistrate Judge Arteaga issued an R&R recommending the denial of Mr. Freeman's claims with prejudice, and without issuing a

7

certificate of appealability.  DI 37.  After receiving an extension to do so, Mr. Freeman filed his objections to Judge Arteaga's R&R on May 29, 2026.  DI 40.  He lodges two objections, asserting that Judge Arteaga erred in denying his claims that Attorney McMahon was ineffective for his failure to (1) investigate, develop, and ensure the presentation of evidence and argument regarding a third-degree murder or voluntary manslaughter verdict; and (2) challenge the constitutionality of imposing mandatory life without parole on Mr. Freeman.  *Id.* at 3.  Mr. Freeman asks us to grant relief on these claims, remand to Judge Arteaga for an evidentiary hearing, or certify this matter for appeal.  *Id.* at 43-44.

## II.    LEGAL STANDARDS

### A.    Standard of review

We review de novo those portions of the R&R to which Mr. Freeman has made specific, timely objections.  28 U.S.C. § 636(b)(1)(C).  Though we are "not required to make any separate findings or conclusions when reviewing a Magistrate Judge's recommendation de novo under 28 U.S.C. § 636(b)[,]" *Hill v. Barnacle*, 655 F. Appx. 142, 148 (3d Cir. 2016), we may "accept, reject, or modify, in whole or in part, the findings or recommendations" and "receive further evidence or recommit the matter to the magistrate with instructions."  28 U.S.C. § 636(b)(1)(C).  Pursuant to our responsibility to make an informed and final determination, we afford "reasoned consideration to the magistrate's report before adopting it as the decision of the court." *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987), *superseded by statute on other grounds as stated in Redding v. Holt*, 252 Fed. Appx. 488, 490 n.1 (3d Cir. 2007).

### B.    AEDPA

Our review of habeas petitions is governed by the Antiterrorism and Effective Death

Penalty Act (AEDPA), 28 U.S.C. § 2241 *et seq.* Applicants for habeas relief generally must first exhaust the remedies available to them in state court for a given claim, prior to seeking relief in federal court for that claim, unless there (1) is a lack of available state corrective process, or (2) are circumstances which render such corrective process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1). If the petitioner has the right under the laws of the state to raise the question presented by any available procedure, and he has not done so, then he has not exhausted his state remedies. 28 U.S.C. § 2254(c).

Nor may we review claims that the state courts denied pursuant to "an adequate and independent state procedural rule" because such a claim is considered procedurally defaulted. *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citation omitted). However, a petitioner may obtain review of procedurally defaulted claims by demonstrating (1) "cause" to excuse his failure to comply with the applicable state procedural rule;[1] and (2) actual prejudice that resulted from the purported constitutional violation.[2] *Id.* at 528 (citations omitted). He may also obtain review of

---

[1] Establishing cause requires showing that an "objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule" where an objective factor is one that "cannot fairly be attributed to" the petitioner. *Davila*, 582 U.S. at 527 (citations omitted). "[A]ttorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel" which includes "[a]n error amounting to constitutionally ineffective assistance [of counsel]." *Id.* (citations omitted). If a petitioner seeks to raise a defaulted ineffective assistance of trial counsel claim, he may rely upon post-conviction counsel's ineffectiveness to raise that claim under the narrow *Martinez* exception. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012). This requires the petitioner to demonstrate that (1) the ineffective assistance of trial counsel claim has some merit; and (2) post-conviction counsel caused the default of the claim by performing "below an objective standard of reasonableness." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 938, 941 (3d Cir. 2019).

[2] Prejudice requires showing that the errors "worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 242 (3d Cir. 2017).

a procedurally defaulted claim by presenting reliable, new evidence that demonstrates his actual innocence such that, with that evidence, "it is more likely than not that no reasonable juror would have convicted" him. *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013); *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Notwithstanding a petitioner's failure to exhaust the state remedies available to him, we may deny habeas relief on the merits. 28 U.S.C. § 2254(b)(2). If a claim was adjudicated on the merits in state court proceedings, then we may not grant an application for habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

A state court's determination of a factual issue is presumptively correct and entitled to substantial deference, and a petitioner may rebut this presumption only via clear and convincing evidence. § 2254(e)(1); *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015). If the petitioner failed to develop the factual basis of a claim in state court proceedings, we shall not hold an evidentiary hearing on the claim unless the petitioner demonstrates (1) that the claim relies upon (a) a new rule of constitutional law that was previously unavailable and was made retroactive by the Supreme Court to cases on collateral review, or (b) a factual predicate which previously could not have been discovered via due diligence; and (2) the underlying facts of the claim would have been sufficient to establish, via clear and convincing evidence, that but-for constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying crime. § 2254(e)(2). Where the state court has not reached the merits of a claim, we conduct *de novo*

10

review over purely legal questions and mixed questions of law and fact. *Taylor v. Horn*, 504 F.3d 416, 429 (3d Cir. 2007) (citation omitted).

**C.      Ineffective assistance of counsel claims**

"The Sixth Amendment guarantees a defendant the effective assistance of counsel at critical stages of a criminal proceeding, including when he enters a guilty plea." *Lee v. United States*, 582 U.S. 357, 363 (2017) (citation modified) (citations omitted).  A defendant (and habeas petitioner) seeking relief based on his counsel's ineffectiveness must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, he must demonstrate that his attorney's performance was deficient — *i.e.*, the attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Second, he must show that this deficient performance prejudiced him — *i.e.*, his attorney's errors were so serious that they "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.*  There is a strong presumption that counsel performed adequately; when a state court has already decided that counsel sufficiently performed, we are "doubly deferential" to that determination. *Id.* at 689; *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (citations omitted).

**III.     DISCUSSION[3]**

**A.      Trial counsel was not constitutionally ineffective for failing to investigate, develop, and present evidence and argument supporting a voluntary manslaughter or third-degree murder verdict**

Mr. Freeman first argues that Attorney McMahon was ineffective because he failed to

---

[3] Though we only address the specific portions of the R&R to which Mr. Freeman objects, we concur with the well-reasoned conclusions of Judge Arteaga's report for the persuasive reasons stated therein.

investigate, develop, and present evidence and argument to support a voluntary manslaughter or third-degree murder conviction.  DI 40 at 9.  He points to four specific instances to support his argument, which pertain to Attorney McMahon's failure to (1) present evidence from Ms. Evans; (2) discover and present evidence from Mr. Webb and Mr. Parker; (3) discover and present evidence regarding Mr. Freeman's traumatic background, mental health issues, cognitive deficits, and youth; and (4) argue third-degree murder as an option during closing argument.  *Id.* at 12-26.  None of these examples of purported ineffectiveness, considered either individually or in the aggregate, has merit upon habeas review.

### i.       Ms. Evans's testimony

First is Mr. Freeman's claim that trial counsel was ineffective for acquiescing to the Commonwealth's objection based upon Ms. Evans's violation of the sequestration order and to the exclusion of her testimony due to this violation.  *Id.* at 13-14.  He asserts that it was objectively unreasonable for trial counsel to intentionally violate the sequestration order (if that is what occurred), fail to make a proffer regarding the substance of Ms. Evans's testimony, and accept the harsh sanction of exclusion without requesting a less severe alternative.  *Id.*

Upon review, the record indicates that there was a sequestration order in effect and that Ms. Evans's presence throughout the trial constituted a violation of that order.  DI 14-7 at 106 (trial court explaining that there was a sequestration order and that Ms. Evans was present throughout the trial despite that order); N.T. 4/20/18 at 317 (trial court confirming that there was a sequestration order "as far as [he] knew" and that Ms. Evans had been sitting in during the testimony); N.T. 4/17/18 at 131 (Commonwealth requesting sequestration, trial counsel acquiescing to the request, and the trial court confirming that no witnesses were present in the

gallery).  The trial court also observed that the defense provided no explanation that Ms. Evans's presence was somehow inadvertent.  DI 14-7 at 106.  It thus appears that trial counsel did not have a viable argument against Ms. Evans's violation of the sequestration order, so it was reasonable for him to acquiesce to that violation.  To the extent it was unreasonable for trial counsel not to offer an argument that her presence in violation of the sequestration order was inadvertent, we note that the trial court — which had the opportunity to observe Mr. Freeman and his counsel throughout the trial — found that both Mr. Freeman and trial counsel were aware of Ms. Evans's presence throughout the trial.  *Id*.  Indeed, during Mr. Freeman's direct examination by Attorney McMahon, counsel asked Mr. Freeman if Ms. Evans was present in the courtroom, to which he confirmed that she was and pointed her out.  N.T. 4/20/18 at 214.  We thus cannot say that it was unreasonable for trial counsel to refrain from arguing that Ms. Evans's presence in violation of the order was inadvertent.

 Nor was it unreasonable for trial counsel to acquiesce to the sanction of precluding Ms. Evans's testimony.  Again, the trial court found that her presence was known to the defense, such that the violation of the sequestration order was knowing.  Though a witness who violates a sequestration order cannot be excluded solely because she violated that order, exclusion of her testimony may be appropriate "under particular circumstances" and "within the sound discretion of the trial court."  *Holder v. United States*, 150 U.S. 91, 92 (1893).  Any such restrictions on a defendant's right to present evidence must not be "arbitrary or disproportionate to the purposes they are designed to serve."  *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (citation omitted).  In *Taylor v. Illinois*, 484 U.S. 400 (1988), the Supreme Court upheld the preclusion of defense evidence as a sanction for the defense's violation of a discovery rule, finding it was not

13

unnecessarily harsh because the record indicated that the defense had engaged in willful misconduct such that "the severest sanction [was] appropriate." *Id.* at 417. We thus agree with the Magistrate Judge's determination that the exclusion of Ms. Evans's testimony was neither disproportionate nor arbitrary, given the trial court's finding that the violation of the sequestration order was willful: the severity of the sanction matched the willful violation of the court's order, and it served to prevent testimony that concerned Ms. Evans's phone conversation with Mr. Freeman on the day of the murder — a conversation to which Mr. Freeman had just testified, in Ms. Evans's presence, right before the defense tried to call Ms. Evans as a witness.

Now let's assume that trial counsel did deficiently perform with respect to the exclusion of Ms. Evans's testimony. Then, Mr. Freeman's best argument is that it was unreasonable for trial counsel to intentionally violate a sequestration order. Assuming *arguendo* that this was unreasonable, Mr. Freeman still cannot demonstrate that he was prejudiced by the exclusion of Ms. Evans's testimony. Even if we could consider Ms. Evans's PCRA testimony, which is out-of-record evidence, *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), we agree with the Magistrate Judge that this evidence — if introduced at trial — would not have changed the trial's outcome.

Ms. Evans's testimony served to corroborate Mr. Freeman's testimony and, in the face of the evidence before the jury, her testimony did not call into question whether Mr. Freeman had the specific intent to kill Mr. Scott. As noted by the Magistrate Judge, the jury had significant evidence from which to infer Mr. Freeman's specific intent to kill, e.g., the video footage of Mr. Freeman committing the shooting, Mr. Byrd's testimony regarding Mr. Freeman's actions right before and during the shooting, and Mr. Freeman's own admission that he shot at Mr. Scott and Mr. Wynder and that he intended to hurt Mr. Scott. N.T. 4/19/18 at 71; N.T. 4/18/18 at 114-20,

14

131-34, 141-44, 153-55; N.T. 4/20/18 at 255-56.  Mr. Freeman testified to his emotions leading up to and during the shooting, N.T. 4/20/18 at 251-56, emotions that were more relevant to his state of mind right before the shooting compared to Ms. Evans's perception of those emotions during her brief phone calls with Mr. Freeman several hours before the shooting.  And we agree with the Magistrate Judge's assessment that, based on the substance of Ms. Evans's PCRA testimony regarding the two men coming to the house in which she and Mr. Freeman lived on July 6th, such testimony would not have sufficed to establish that Mr. Scott had committed a serious provocation against Mr. Freeman, as she did not identify that Mr. Scott was one of the men.  N.T. 3/4/22 at 44.  For his part, Mr. Freeman testified that he thought Mr. Scott was one of the men that came to the house, but he did not testify that Ms. Evans told him that Mr. Scott was one of the men.  N/T 4/20/18 at 244.

The result would not change even if we assumed everything in Mr. Freeman's favor based on Ms. Evans's proposed testimony — these assumptions being that (1) Mr. Scott made a death threat against Mr. Freeman the day before the murder; (2) Mr. Scott threateningly visited the house where Mr. Freeman was staying on July 6th; (3) Ms. Evans informed Mr. Freeman of this visit; (4) those events constituted serious provocations; and (5) such provocations occurred no more than four hours before the shooting.  *See, e.g.*, *Commonwealth v. Thornton*, 431 A.2d 248, 252 (Pa. 1981) (affirming first-degree murder conviction where 3-4 hours elapsed between the purported serious provocation and the time the defendant committed the killing); *Commonwealth v. Barnosky*, 258 A.2d 512, 515 (Pa. 1969) (finding 4-5 minutes constituted a sufficient cooling off period to defeat a heat of passion defense); *Commonwealth v. Whitfield*, 380 A.2d 362, 366 (Pa. 1977) (finding 30-60 minutes provided a sufficient cooling off period).

15

Nor would Ms. Evans's testimony have done anything to support an imperfect self-defense theory, as the evidence clearly showed that Mr. Freeman did not comply with this duty to retreat. *Commonwealth v. Burns*, 416 A.2d 506, 507 (Pa. 1980).  We thus conclude that the exclusion of Ms. Evans's testimony at trial did not prejudice Mr. Freeman by depriving him "of a fair trial . . . whose result is reliable."  *Strickland*, 466 U.S. at 687.

**ii.    The evidence from Mr. Webb and Mr. Parker**

Mr. Freeman next argues that Attorney McMahon was ineffective because he failed to investigate, discover, and present evidence from Mr. Webb and Mr. Parker.  DI 40 at 15-18.  He asserts that both Mr. Webb and Mr. Parker would have testified that Mr. Freeman was not the person who shot Mr. Scott on July 5th, which he claims "would have significantly detracted from the prosecution's theory of the case" that Mr. Freeman was targeting Mr. Scott as early as July 5th and that he finished the job the next day.  *Id.* at 15-17.  Mr. Freeman also asserts that Mr. Webb would have testified "that [Mr.] Scott was eager to use lethal force and was intent on killing [Mr.] Freeman" based on his interaction with Mr. Scott after he was shot in the back.  *Id.* at 15.

The PCRA court addressed Mr. Freeman's ineffectiveness claim regarding the testimony of Mr. Webb and Mr. Parker on the merits, heard their testimony at an evidentiary hearing, and found them not credible.  DI 14-8 at 5.  We owe this credibility determination great deference.  *Commonwealth v. Martin*, 5 A.3d 177, 197 (Pa. 2010) ("[F]act-based findings of a post-conviction court, which hears evidence and passes on the credibility of witnesses, should be given great deference . . . particularly where . . . the PCRA court judge also served as the trial court judge.") (citations omitted).  And both the PCRA court and Superior Court concluded that

16

this ineffectiveness claim lacked merit, so our review is "doubly deferential." *Dunn*, 594 U.S. at 739.  We also have no reason to conclude that the state courts misapplied *Strickland*.  Attorney McMahon was not informed of the availability of Mr. Webb and Mr. Parker, so it was not unreasonable for him not to investigate and call these witnesses.  Even if his failure to do so was unreasonable, the testimony of Mr. Webb and Mr. Parker would not have altered the outcome of the case.  Neither Mr. Webb nor Mr. Parker could have testified as to Mr. Freeman's state of mind right before or during the shooting.  Instead, their testimony would have corroborated the story told by Mr. Freeman during trial regarding the events leading up to the July 6th shooting.  That testimony would not have refuted the significant evidence indicating Mr. Freeman's specific intent to kill Mr. Scott and his failure to retreat.  And the PCRA court, which was best positioned to assess the credibility of Mr. Webb and Mr. Parker, found them not credible.  The exclusion of their testimony did not prejudice Mr. Freeman under *Strickland*.

### iii.    Evidence regarding Mr. Freeman's traumatic background, mental health issues, cognitive deficits, and youth

Third, Mr. Freeman contends that Attorney McMahon was ineffective because he failed to investigate, discover, and present evidence regarding Mr. Freeman's youthful immaturity and traumatic social history, which included an unstable home environment and mental, cognitive, and emotional issues.  DI 40 at 18-25.  He points to the various exhibits that he attached in his initial *pro se* PCRA filing, which his PCRA attorney — Attorney Hobson — did not include in his amended PCRA petition.  *Id.* at 18-21.  These exhibits included affidavits from witnesses who would have testified about Mr. Freeman's mental health and emotional issues, as well as documents from educational and health providers detailing such issues.  DI 14-7 at 249-337.

But even if we could consider this evidence, such exhibits — either individually or

17

considered in the aggregate — do not negate or in any way relate to Mr. Freeman's specific intent to kill Mr. Scott nor to any serious provocation that could have supported a heat of passion defense. There is no connection drawn between Mr. Freeman's mental and emotional issues and trauma and his ability to form the specific intent to kill Mr. Scott, from an expert or other source. As the Pennsylvania Supreme Court has explained in the context of a defendant seeking to raise a diminished capacity defense, for evidence to be admissible to negate a defendant's specific intent, that evidence "must necessarily put into question the criminal defendant's very ability to form the intent to kill" and "[e]vidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill." *Commonwealth v. Mason*, 130 A.3d 601, 631 (Pa. 2015) (citation modified) (citation omitted). The Court also emphasized that the evidence "must provide insight as to the defendant's mental state at the time of the offense." *Id.* (citation omitted). Nor does *Miller v. Alabama*, 567 U.S. 460 (2012), state or imply that young adults cannot form the specific intent to kill. And even juvenile defendants may be convicted for first-degree murder. *See, e.g.*, *Commonwealth v. Batts*, 66 A.3d 286, 295-96 (Pa. 2013). Further, this evidence and testimony do not demonstrate that Mr. Freeman, at the time of the shooting, suffered a sudden and intense passion due to his mental health and emotional issues or his traumatic background. Any argument by trial counsel that Mr. Freeman lacked the specific intent to kill or otherwise suffered from a heat of passion, based on this purported evidence, would have been meritless. So, Attorney McMahon could not have been ineffective for failing to investigate, discover, and present such evidence at trial.

iv.    **Lack of a third-degree murder argument during closing**

Finally, Mr. Freeman asserts that Attorney McMahon was ineffective based on his failure

18

to argue that third-degree murder was an option during his closing argument.  DI 40 at 25-26.

He notes that Mr. Wilson's attorney emphasized his client's lack of a specific intent to kill, and

that the jury concluded that Mr. Wilson lacked such intent.  *Id.*  Mr. Freeman reasons that the

jury, if provided with such argument by Attorney McMahon, could have reached the same

conclusion regarding Mr. Freeman.  *Id.* at 26.

Closing arguments, just like all attorney arguments, are not evidence.  Third Circuit

Model Criminal Jury Instructions, Chapter 3.  The jury's job was to consider the evidence before

it and determine which, if any, of the charges were supported by the evidence beyond a

reasonable doubt, and it received an instruction on the elements of third-degree murder, as well

as a copy of the first-degree murder and third-degree murder instructions for its deliberations.

N.T. 4/23/18 at 198-202.  Even if Attorney McMahon had argued for third-degree murder in his

closing arguments, that argument would not have changed the slim evidence before the jury

supporting a third-degree murder conviction and the substantial evidence supporting a first-

degree murder conviction, as discussed.  Thus, we cannot conclude that Attorney McMahon was

constitutionally ineffective for failing to argue third-degree murder in his closing arguments:

even if it was unreasonable for him not to make such an argument, his failure to do so did not

reasonably alter the outcome of the trial to Mr. Freeman's detriment under *Strickland*.

**v.**      **The cumulative effect of these alleged errors does not warrant habeas relief**

Mr. Freeman criticizes the R&R for its individualized assessment of each alleged

instance of trial counsel's ineffectiveness, rather than considering the cumulative effect of these

purported errors.  DI 40 at 26-29.  But part of assessing cumulative prejudice requires close

attention to the specific instances of alleged ineffectiveness, in addition to considering the total

19

effect of those instances taken together.  As explained above, Mr. Freeman was not prejudiced at trial by the lack of (1) testimony from Ms. Evans, Mr. Webb, and Mr. Parker; (2) evidence regarding Mr. Freeman's traumatic history and mental and emotional issues; or (3) argument during closing for a third-degree murder verdict.  In combination, these non-prejudicial instances do not amount to prejudice, either; even if all such evidence and argument were presented at trial, it would not have rebutted the substantial evidence in the record which supported Mr. Freeman's first-degree murder conviction nor changed the fact that the jury had third-degree murder available as a verdict option during its deliberations.  We thus conclude that Attorney McMahon was not ineffective based on his failure to investigate, develop, and present evidence and argument supporting a voluntary manslaughter or third-degree murder verdict, so habeas relief on this basis is not warranted.

**B.      Trial counsel was not ineffective for failing to argue that the imposition of mandatory life without parole as applied to him was unconstitutional**

Mr. Freeman's second basis for Attorney McMahon's ineffectiveness is his failure to argue that it was unconstitutional to sentence him to mandatory life without parole because he was eighteen when he committed the offense.  DI 40 at 40-43.  He asserts that the rationale of *Miller* — which held that mandatory life without parole for individuals who commit crimes when they are under eighteen years old is unconstitutional — applies to him as a young person because, even though he was eighteen at the time of his crime, he shared the core developmental differences possessed by youthful offenders that were central to the Supreme Court's ruling.  *Id.* And he points to examples of courts that have applied *Miller* to individuals who were eighteen or older when they committed their offenses.  *Id.* at 42 n.22 (citations omitted).

20

Mr. Freeman's argument lacks merit.  As the Magistrate Judge explained, the *Miller* Court limited its new constitutional rule to defendants who were under 18 years old when they committed their crimes.  *Miller*, 567 U.S. at 465.  The Third Circuit has confirmed that *Miller* "drew [the line] at eighteen."  *In re Rosado*, 7 F.4th 152, 159-60 (3d Cir. 2021) (citations omitted).  Pennsylvania courts have followed suit.  *See, e.g.*, *Commonwealth v. Lee*, 2026 WL 855614, at *13 (Pa. Mar. 26, 2026); *Hill v. Governor of Commonwealth*, 309 A.3d 238, 244-45 (Pa. Cmwlth Ct. 2024), *aff'd by* 317 A.3d 551 (Pa. 2024) (per curiam); *Commonwealth v. Furgess*, 149 A.3d 90, 94 (Pa. Super. 2016).  Less than three months ago, the Pennsylvania Supreme Court reaffirmed that, for Eighth Amendment purposes, there is a constitutional difference between children and adults, such that *Miller* and its related cases do not apply (at least absent further guidance from the Supreme Court) to "the mandatory sentencing of adults to life without parole."  *Lee*, 2026 WL 855614, at *13.  Though we understand the argument that eighteen might be an arbitrary line, it is a line that the Supreme Court has established when evaluating the relevant culpability of minors (who are under eighteen) and adults (who are eighteen and older).  Indeed, *Montgomery v. Louisiana*, 577 U.S. 190 (2016), a case upon which Mr. Freeman relies in his objections, repeatedly discusses the reasoning of *Miller* and its related cases as fundamentally being based on the differences between minors (or juveniles) and adults.  *Id.* at 207-09.  The emphasis is on this difference between those who are children and those who are adults, and in the United States, the line between these two groups is eighteen years old.

Whether characterized as an extension of *Miller* or an application of the reasoning expressed therein, Mr. Freeman's argument that Attorney McMahon should have challenged the constitutionality of mandatory life without parole as applied to him as an eighteen-year-old

defendant is not meritorious.  It was not unreasonable for Attorney McMahon to forgo raising an argument that has been rejected by courts in this circuit and in Pennsylvania.  Even if it was unreasonable, given such precedent, this argument would not have won the day and thus would not have changed the outcome of Mr. Freeman's sentence.  Habeas relief is not warranted on this basis.

IV.    CONCLUSION

For the reasons stated in this memorandum, we disagree with Mr. Freeman's objections to the Magistrate Judge's R&R.  On this record, Attorney McMahon was not constitutionally ineffective regarding his investigation and presentation of evidence in support of a voluntary manslaughter or third-degree murder verdict, nor regarding his lack of argument about the constitutionality of Mr. Freeman's mandatory life without parole sentence.  We thus agree with Judge Arteaga that no habeas relief is warranted on these claims and deny Mr. Freeman's petition without an evidentiary hearing and without issuing a certificate of appealability.  An appropriate order accompanies this memorandum.